IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:17-CR-69-D

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| FARUQ ROSE | ) |
| | ) |
| Defendant. | ) |

On June 27, 2017, a federal grand jury indicted Faruq Rose ("Rose") and charged him with one count of conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and one count of possession with the intent to distribute a quantity of a mixture and substance containing a detectable amount of cocaine [D.E. 1]. On July 2, 2018, Rose moved to suppress all evidence seized as the result of a search of two packages at a FedEx hub in Greensboro, North Carolina, and a subsequent controlled delivery [D.E. 56]. On July 26, 2018, the government responded in opposition [D.E. 59]. On August 17, 2018, the court held a hearing concerning the motion to suppress. See [D.E. 62, 63, 64]. On August 31, 2018, the parties submitted supplemental briefing. See [D.E. 65, 66]. On September 7, 2018, Rose replied to the government's supplemental brief. See [D.E. 67]. As explained below, the court denies Rose's motion to suppress.

I.

In approximately September 2016, Rose asked Donald Ray West ("West"), a man he had known for about twenty years, if Rose could have certain packages addressed in the name of West's deceased brother, Ronald West, delivered to West's residence at 5447 Highway 41 South, Wallace, North Carolina. See Hr'g Tr. [D.E. 64] 71–78. In return, Rose (who West also knew as Boo-Boo)

offered to pay West $25 per package, and West agreed not to touch the packages. See id. at 72, 78. When West and Rose made this agreement, Rose did not live at the residence and West believed that Rose was a drug dealer. See id. at 70–74. In accordance with this agreement, an unidentified person in Chandler, Arizona, shipped packages to West's residence approximately three times before October 21, 2016. See id. at 40–41, 73–74. West did not touch the packages when they were delivered to his residence. See id. at 77–78. Rather, on each occasion, Rose went to West's residence and retrieved the packages from West's front porch. See id. Rose paid West either $25 or $50 per package. See id. at 72.

On October 21, 2016, Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Kevin Cornell and Guilford County Sheriff's Office Deputy Sheriff T.E. Gordy were screening packages at the FedEx Air Hub in Greensboro, North Carolina, as part of an agreement between FedEx and DEA. See id. at 23–24, 39. TFO Cornell testified that law enforcement assists FedEx in identifying suspicious packages that may contain contraband. See id. at 22. In determining whether a package looks suspicious, officers examine factors including (1) the type of box used (i.e., engineered boxes versus plain shipping boxes); (2) whether the package is heavily taped; (3) whether the package is solidly packed; (4) the shipping method used (i.e., priority overnight versus standard shipping); and (5) the sender's location. See id. at 17–20.

On October 21, 2016, Deputy Gordy noticed a suspicious package on the conveyor belt. See id. at 39–40. Deputy Gordy thought the package looked suspicious because of the type of box, the way it was taped, and the sender's location (i.e., Chandler, Arizona). See id. at 40. Deputy Gordy pulled the package off the belt and read the shipping label. Id. Deputy Gordy observed that the package was densely packed and shipped from a third-party shipper in Chandler, Arizona, a city near the United States-Mexico border and a source city for illegal narcotics. See id. The shipper

2

addressed the package to Ronald West and included a phone number. Id. Deputy Gordy ran the recipient's address through CLEAR, an investigative software program, and found that no one with the name Ronald West was associated with the listed address. See id. at 40–41. Deputy Gordy also ran the recipient's listed phone number through CLEAR and found that no one with the name Ronald West was associated with the listed phone number. See id. at 41.

Deputy Gordy contacted TFO Cornell concerning the suspicious package and told him that he believed the package contained narcotics. See id. at 42. The officers decided to alert FedEx Manager Williams about the suspicious package. See id. Deputy Gordy then brought the package to Williams. After Williams spoke with Deputy Gordy and examined the package, Williams decided to open the package. Id. The package contained approximately two kilograms of cocaine. Id.

Shortly thereafter, while standing at another conveyor belt, TFO Cornell noticed a second suspicious package on the belt. See id. at 49–50. The second package bore similar characteristics to the first package and included a shipping label from Chandler, Arizona, to Ronald West at the same address in Wallace, North Carolina. See id. at 50–51. TFO Cornell contacted Deputy Gordy and told him that he may have found a sister package. Id. at 51. Deputy Gordy told TFO Cornell that the first package contained two kilograms of cocaine. See id. at 52. Based on this information, TFO Cornell decided to conduct a K-9 sniff on the second package. See id. As part of the K-9 sniff, TFO Cornell lined up four non-suspicious packages with the suspicious package and ran his K-9 Maggie down the line of packages. See id. at 53. Maggie alerted to the suspicious package, indicating that Maggie smelled narcotics in the package. See id. Deputy Gordy and TFO Cornell then took the package to the special operations office in Greensboro. See id. at 53–54. After obtaining a search warrant for the second package, law enforcement opened the package. See id. As with the first package, the second package contained two kilograms of cocaine. Id. at 54.

TFO Cornell contacted DEA TFO Tony DiGiovanni, an agent in the Wilmington DEA office, to see if he could coordinate a controlled delivery to the listed address in Wallace, North Carolina. See id. at 56. TFO DiGiovanni agreed to assist in conducting a controlled delivery. TFO Cornell and Deputy Gordy then drove to Wilmington to meet TFO DiGiovanni and other officers. See id. at 56–57. After planning the controlled delivery, TFO Cornell and Deputy Gordy delivered the two packages to 5447 Highway 41 South, Wallace, North Carolina, and left the packages on the porch. See id. at 57. Meanwhile, Detective James Carl Mobley and Detective Shane Miller surveilled the residence. See id. at 65–66. After the packages were delivered, the detectives observed two males, later identified as Rose and LaVonne Murray, drive to the residence in a silver car, unload bags from the trunk, and take the bags into the residence. See id. at 67. Rose and Murray did not touch the packages on the porch and left. See id. Subsequently, the resident, Donald Ray West, arrived on a bicycle. See id. West entered the residence but did not touch the packages on the porch. See id. Shortly thereafter, Rose and Murray returned in the silver car, retrieved the packages from the porch, and loaded the packages into the silver car. See id. at 67–68.

Law enforcement followed Rose and Murray and attempted to initiate a traffic stop. See id. at 68. Rose, the driver, attempted to evade law enforcement but collided head-on with an unmarked law enforcement vehicle in a Walgreens parking lot. See id. at 68–69. Law enforcement arrested Rose and gave him a <u>Miranda</u> warning. See id. at 69, 84. Rose waived his rights and told law enforcement officers that the packages in his vehicle contained cocaine and that he was working with a sophisticated drug organization to smuggle cocaine from California to Eastern North Carolina. See id. at 69, 84–85. Rose gave law enforcement details concerning the drug organization and provided law enforcement with the names of the individuals with whom he trafficked cocaine. See id. at 84–90.

II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search is unreasonable when it infringes on an expectation of privacy "that society is prepared to consider reasonable." United States v. Jacobsen, 466 U.S. 109, 113 (1984); see Byrd v. United States, 138 S. Ct. 1518, 1526 (2018); United States v. Castellanos, 716 F.3d 828, 832–35 (4th Cir. 2013). The right to "be free from an unreasonable search is personal" and "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007) (emphasis omitted); see Minnesota v. Carter, 525 U.S. 83, 88 (1998); Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). The defendant bears the burden of proving that he had a legitimate expectation of privacy in the property searched. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Castellanos, 716 F.3d at 832; United States v. Givens, 733 F.2d 339, 341–43 (4th Cir. 1984) (per curiam). To do so, the defendant must show that he exhibited an actual (i.e., subjective) expectation of privacy and that the expectation of privacy is one that society is prepared to recognize as reasonable (i.e., objective). See Byrd, 138 S. Ct. at 1527; Carpenter v. United States, 138 S. Ct. 2206, 2237 (2018) (Thomas, J., dissenting); Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); Castellanos, 716 F.3d at 832; United States v. Bullard, 645 F.3d 237, 242–43 (4th Cir. 2011); United States v. Bynum, 604 F.3d 161, 164 (4th Cir. 2010).

Although the Supreme Court has not "set forth a single metric or exhaustive list of considerations to resolve the circumstances in which a person can be said to have a reasonable expectation of privacy, it has explained that legitimation of expectations of privacy by law must have

5

a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Byrd, 138 S. Ct. at 1527 (quotation and alteration omitted); see Carpenter, 138 S. Ct. at 2213–14; United States v. Jones, 565 U.S. 400, 407–08 (2012); Rakas, 439 U.S. at 143–44 & n.12. Thus, in assessing whether a defendant had a reasonable expectation of privacy in property at the time of the search, courts consider factors such as whether the defendant owned or claimed ownership or possessory interest in the property searched, whether the defendant had the right to exclude others from the property searched, and whether the defendant took steps to maintain his privacy in the property searched. See Byrd, 138 S. Ct. at 1527; Castellanos, 716 F.3d at 834; Casella v. Borders, 404 F. App'x 800, 802 (4th Cir. 2010) (per curiam) (unpublished); United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992); Givens, 733 F.2d at 342.

Rose argues that he had a legitimate expectation of privacy in the two packages that were sent from Chandler, Arizona, to Ronald West at 5447 Highway 41 South, Wallace, North Carolina. "Both the sender and the designated recipient of a package sent by mail or other carrier have a legitimate expectation of privacy in the contents of that package." United States v. Hurley, 182 F. App'x 142, 145 (4th Cir. 2006) (per curiam) (unpublished); see Jacobsen, 466 U.S. at 114; Givens, 733 F.2d at 341. In some circumstances, individuals "may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." Castellanos, 716 F.3d at 834; see United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992). Individuals may not, however, assert a reasonable expectation of privacy in a package addressed to a third party. See Castellanos, 716 F.3d at 834; Givens, 733 F.2d at 341.

Rose argues that he was the designated recipient of the packages because Ronald West is his alias. See [D.E. 56] 8–9; [D.E. 66] 4, 6–7. Rose also argues that he has a reasonable expectation

6

of privacy in the packages because he repeatedly claimed ownership of the packages once the packages were delivered to the porch. See [D.E. 66] 6. Finally, Rose argues that he had a reasonable expectation of privacy in the packages because he sometimes resided at 5447 Highway 41 South, Wallace, North Carolina. See [D.E. 56] 10–11.

The court rejects Rose's arguments. Rose had no right or ability to exclude others from the packages once the sender delivered the packages to FedEx in Chandler, Arizona, with no link to Rose that would allow Rose to control delivery of the packages or to assert ownership over the packages. See United States v. Pitts, 322 F.3d 449, 456–57 (7th Cir. 2003); see also Hurley, 182 F. App'x at 145. The sender addressed the packages to Ronald West, the deceased brother of Donald Ray West, not to Rose. Rose did not reside at the address listed on the labels, and Rose presented no evidence that the phone number on the packages was his phone number. Moreover, Rose presented no evidence that anyone knew him by the name Ronald West or that the name Ronald West was his alias. See Hr'g Tr. at 70–74. These facts defeat Rose's arguments concerning his privacy interest in the packages and his ability to exclude others at the time of the search. See Hurley, 182 F. App'x at 145; Pitts, 322 F.3d at 456.

Two examples illustrate this point. First, if FedEx held the packages at its facility in Greensboro, Rose would not have been able to retrieve the packages because he would not have been able to produce any evidence or identification to show that he was Ronald West. See Hurley, 182 F. App'x at 145; Pitts, 322 F.3d at 456–57. Similarly, if a third party intercepted the packages while in transit, Rose would have had no way to assert an ownership or possessory interest in the packages. See Pitts, 322 F.3d at 456–57.

In opposition, Rose cites Villarreal and argues that his use of an "alias" does not defeat his reasonable expectation of privacy in the packages. See Villarreal, 963 F.2d 772–75; see also

7

Castellanos, 716 F.3d at 833–34. This case is distinguishable from Villarreal. In Villarreal, the defendant shipped a 55-gallon drum to himself using the alias Roland Martin. Villarreal, 963 F.2d at 772–73. Unlike Rose, the defendant in Villarreal had a publicly-established connection to his alias. See id. at 774–75. The defendant had an invoice for the package that bore the name Roland Martin, and the defendant had been introduced to at least one other individual as Roland Martin. See id. Because the defendant in Villarreal had the package's invoice and a publicly-established alias, he had the power to control delivery and assert ownership. See id.; see also United States v. Lozano, 623 F.3d 1055, 1064 (9th Cir. 2010) (O'Scannlain, J., concurring) ("In addition, even if [defendant] had claimed to be the rightful recipient, the Fifth Circuit line of cases involves defendants who had publicly-established connections to their alter ego."); United States v. Goldsmith, 432 F. Supp. 2d 161, 170–73 (D. Mass. 2006); People v. Lombardo, 216 Mich. App. 500, 508–09, 549 N.W.2d 596, 599–600 (1996). At the time of the search, however, Rose had no power to control the delivery of the packages or to assert ownership in the packages because he had no link to the packages that society is prepared to recognize as reasonable. Accordingly, Rose could not exclude others from the packages once they were delivered to FedEx in Chandler, Arizona, and were searched in the FedEx facility in Greensboro. See, e.g., Rawlings, 448 U.S. at 104–06; Rakas, 439 U.S. at 144 n.12; Hurley, 182 F. App'x at 145; United States v. Forte, 65 F. App'x 508, 2003 WL 1922910, at *4 (5th Cir. 2003) (per curiam) (unpublished); Pitts, 322 F.3d at 457; Goldsmith, 432 F. Supp. 2d at 170–73.

Rose also argues that he asserted ownership over the packages once the officers delivered them to the porch. In making this argument, Rose cites statements that he made to law enforcement after law enforcement apprehended him. Rose argues that he admitted to law enforcement that he was the intended recipient of the packages and that Murray was not involved. See [D.E. 56] 8. Rose also argues that he was a close friend of Donald West and had a "track record" of receiving packages

8

at West's residence addressed to Ronald West. See id. at 9.

The court rejects the argument. The relevant inquiry is whether Rose had any claimed ownership or possessory interest in the packages at the time of the search. See, e.g., Rawlings, 448 U.S. at 106; Castellanos, 716 F.3d at 833; United States v. Carlisle, 614 F.3d 750, 757–60 (7th Cir. 2010); Forte, 2003 WL 1922910, at *4. When law enforcement searched the packages at the FedEx facility, Rose was completely disassociated from the packages. Rose did not use his real name, real address, or real phone number. Furthermore, Rose did not have a receipt, invoice, or any other means of identification that would allow him to claim ownership of the packages. Instead, Rose took numerous steps beyond simply using an alias to insulate himself from any claim that he owned the packages. See Goldsmith, 432 F. Supp. 2d at 175 ("By giving a fictitious name for the company and individual [defendant] listed on the bill of lading as the shipper, [defendant] attempted to insulate himself from any possible claim that he was an owner of the marijuana or knew what was in the crate."); United States v. Wood, 6 F. Supp. 2d 1213, 1224 (D. Kan. 1998) ("[Defendant] opted to conceal any purported interest in the package and consciously avoided any public announcement that he had a subjective expectation of privacy in the package."); see also United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987). Accordingly, based on the totality of the circumstances, Rose did not have a objectively reasonable expectation of privacy in the packages when law enforcement searched the packages. Thus, Rose lacks standing, and the court denies Rose's motion to suppress. See, e.g., United States v. Santillan, No. 16-1112-cr, 2018 WL 4038032, at *10 (2d Cir. Aug. 24, 2018); Castellanos, 716 F.3d at 834–45.

III.

In sum, the court denies Rose's motion to suppress [D.E. 56].

9

SO ORDERED. This 20 day of September 2018.

                                                                JAMES C. DEVER III
                                                                Chief United States District Judge